**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION—AT LEXINGTON**

| | |
|---|---|
| **ROBERT M. MCKINNEY, et al.,** | **CIVIL ACTION NO. 5:12-CV-360-KKC** |
| **Plaintiffs,** | |
| **V.** | **MEMORANDUM<br>OPINION AND ORDER** |
| **LEXINGTON-FAYETTE URBAN<br>COUNTY GOVERNMENT, et al.,** | |
| **Defendants.** | |

On May 22, 2012, Jeffrey M. McKinney died while incarcerated in the Fayette County Detention Center ("FCDC"). Plaintiffs[1] brought an action against Defendants[2] for alleged deliberate indifference, excessive force, ratification of illegal and unconstitutional conduct, illegal policies and practices, inadequate training and supervision, and a custom of tolerance for failing to provide necessary medical care all in violation of 42 U.S.C. § 1983, the Eighth Amendment's prohibition against cruel and unusual punishment, and various Kentucky torts. The Defendants moved for complete or partial summary judgment with respect to these claims. (DE 176; DE 177; DE 182). For the following reasons, the Court will grant in part and deny in part the Defendants' motions.

---

[1] Plaintiffs include Robert M. McKinney, in his capacity as Personal Representative of the Estate of Jeffrey M. McKinney; Sherri McKinney, in her capacity as Next Friend of Z.M., a minor child of Jeffrey M. McKinney; and Rachel McKinney, in her capacity as Next Friend of C.M. and J.M., minor children of Jeffrey M. McKinney (collectively "Plaintiffs").

[2] Defendants include the Lexington-Fayette Urban County Government ("LFUCG"), the Lexington-Fayette Urban County Government, Division of Community Corrections ("LFUCG Division"), numerous correctional officers of FCDC in their individual capacity, Corizon, Inc., and numerous nurses of FCDC in their individual capacity. For simplicity, the Court will refer to LFUCG and LFUCG Division by name or as "municipal Defendants;" the Court will refer to all correctional officers, despite their rank, as "Officer _" or "Defendant-Officer;" and the Court will refer to the nurses as "Nurse _" or "medical Defendants."

# I. BACKGROUND[3]

On May 17, 2012, Jeffrey McKinney pleaded guilty to a second offense of operating a motor vehicle while impaired and received a fourteen-day sentence. (DE 178-3 Guilty Plea at 2–3.) He reported to FCDC later that day and, during his intake, he stated that he suffered from various medical conditions that required him to take medications. (DE 178-4 Intake Questionnaire at 2.) McKinney told the intake nurse that he suffered from seizures; a traumatic brain injury and a skull fracture from an ATV accident; and hypertension. (DE 182-2 Dep. of Christina Brown, hereinafter "Brown Dep.," at 39–40.) He brought his medication to FCDC. The intake nurse noted that McKinney regularly took the following medications: (1) Ativan, a benzodiazepine that acts as an antianxiety, anticonvulsant, muscle relaxant, sedative, and amnestic; (2) Keppra, antiseizure medication; (3) Depakote, antiseizure medication; (4) Lisinopril, an angiotensin-converting enzyme ("ACE") inhibitor used to treat hypertension, congestive heart failure, and heart attacks; (5) Flexeril, a muscle relaxant; (6) Zanaflex, a muscle relaxant; (7) Hydromorphone, an opioid pain medication; (8) Trazodone, an antidepressant; (9) Cymbalta, used to treat depression, anxiety, and fibromyalgia; (10) Prevacid, an inhibitor of the stomach's production of gastric acids; and (11) Guaifenesin, an expectorant that helps loosen congestion in the chest and throat easing the ability to cough out through the mouth. (Brown Dep. at 46–48, 50–51.) FCDC, however, does not permit inmates to use narcotic medications unless the medical staff "can verify that there's a reason, legitimate reason, for [the inmate] to take them and continue them." (DE 180-5 Dep. of Donna Schwartz, hereinafter "Schwartz Dep.," at 58.) Therefore, the nurse practitioner ordered that McKinney receive a "benzodiazepine

---

[3] Because the Defendants have moved for summary judgment, this Court must view the facts in the light most favorable to Plaintiffs and may not resolve any disputed issues in favor of the Defendants. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

withdrawal protocol," slowly reducing the dosage of Ativan, and the intake nurse ordered McKinney to Unit A—the Medical Unit—for observation while receiving the withdrawal protocol. (Brown Dep. at 56–58; Schwartz Dep. at 68–71.)

McKinney remained in Unit A until May 21, 2012, when he completed the benzodiazepine withdrawal protocol from Ativan. (Schwartz Dep. at 71.) The nurse practitioner ordered that he join the general prison population. (Schwartz Dep. at 71.) At 12:49 p.m. on May 22, 2012, McKinney suffered a seizure while taking a shower in the general prison population. (DE 178-11 Lowe Incident Report, hereinafter "Lowe Report," at 2.) He collapsed to the floor, was visibly shaking, flailed his arms and head, and experienced difficulty breathing. (Lowe Report at 2.) The correctional officers requested a "Code 100." (Lowe Report at 2.) A Code 100 is signaled whenever an inmate is in an emergency physical condition requiring medical care. (DE 179-2 at 2.) Five medical professionals and three officers responded; McKinney was turned on his side, supported throughout the incident, and relocated to Unit A in a wheelchair. (Lowe Report at 2.)

Within hours, McKinney suffered a second seizure. (DE 178-14 Wingate[4] Incident Report, hereinafter "Wingate Report," at 3.) He was in room A9—a "sub day" room that houses eight or nine beds and adjoins the main open area "program space" of Unit A. (DE 182-4 Dep. of Laura Northrip, hereinafter "Northrip Dep.," at 59.) Officer Joquetta Wingate signaled a Code 100, directed the other inmates to exit A9 to the program space, pushed the bunks away from McKinney, and turned him on his side. (Wingate Report at 3.) Officer Wingate and Officer Eric Legear stabilized McKinney during his second seizure. (Wingate Report at 3.) During his second seizure, he severely bit his tongue and had a lot of bloody, frothy saliva secretions coming out of his mouth. (Northrip Dep. at 68–69; *see also* Wingate

---

[4] Joquetta Wingate is formerly Joquetta Leach-McCord. For simplicity, the Court will only refer to the Defendant as Joquetta Wingate.

Report at 3; DE 178-15 Legear Incident Report, hereinafter "Legear Report," at 3.) McKinney spat some blood out of his mouth. Nurse Trevor Newton did not believe that McKinney spat intentionally, but the correctional officers interpreted McKinney's spitting as an intentional act and "attempted to control the subject." (*Compare* DE 182-7 Dep. of Trevor Newton, hereinafter "Newton Dep.," at 28–29, *with* Legear Report at 3.)

The correctional officers issued verbal commands for McKinney to stop spitting, but he continued to spit, became highly erratic, and exhibited defensive resistance. (DE 178-33 Moss Incident Report, hereinafter "Moss Report," at 3.) More officers entered A9 and attempted to "gain control" of McKinney. (Legear Report at 3.) Officer Randy Jones, the shift commander, arrived and assisted Officer Legear in turning McKinney on his stomach. (DE 178-32 Jones Incident Report, hereinafter "Jones Report," at 3.) McKinney vomited. (Jones Report at 3.) By this time, Officers Randy Jones, Nicholas Elko, Adam Moss, Eric Legear, Regina Powell, Joquetta Wingate, and Clarissa Arnold "assisted with restraining" McKinney. (DE 178-36 Arnold Incident Report, hereinafter "Arnold Report," at 2.) Then, Officer Arnold requested a "Signal 7." (Arnold Report at 2.) Toning a Signal 7 means that a correctional officer needs assistance and the on-scene commander must respond to provide assistance and other officers may respond if available and not on break. (DE 194-1 at 20–21.)

Officer Wingate attempted to place a spit hood[5] on McKinney but could not because he was too combative and resistant. (Wingate Report at 3.) Officer Moss then gave verbal commands for McKinney to cooperate. (Wingate Report at 3.) McKinney did not react to Officer Moss's verbal commands; therefore, he performed a mandibular angle pressure

---

[5] A "spit hood" is comprised of filtration fabric that is intended to cover the lower half of the face below the nostrils to contain contaminants and is a deterrent against biting and spitting. The filtration fabric is kept in place with mesh fabric that covers the upper half of the face and elastic bands that secure the hood to the inmate's face. (DE 194-1 at 58.)

4

point control technique to force McKinney to comply with the correctional officers' directives. (Moss Report at 3.) McKinney did not respond to Officer Moss's actions. (Wingate Report at 3.) Officer Wingate then commenced verbal commands and attempted to perform a mandibular angle pressure point control technique on McKinney. (Wingate Report at 3.) Officer Elko warned McKinney that he would use pepper spray if McKinney's actions did not cease, but McKinney continued his defensive resistance to the correctional officers' actions and commands; therefore, Officer Elko administered a single, two-second burst of pepper spray to McKinney's face. (Jones Report at 3.)

The effects of the pepper spray enabled Officer Wingate to properly perform a mandibular angle pressure point control technique so that other correctional officers could apply handcuffs and shackles. (Jones Report at 3; Wingate Report at 3.) Once McKinney's arms and legs were restrained, Officer Wingate administered a spit hood. (Wingate Report at 3–4.) The correctional officers lifted McKinney off the floor and sat him on a bunk in A9 so that medical staff could decontaminate the pepper spray residue. (Moss Report at 3.) Officer Jones determined that McKinney "continued to be unstable" and decided that McKinney should be removed to the Unit A program area and placed in a restraint chair[6] "where the medical assessment and decontamination could be completed." (Jones Report at 3; *see also* DE 178-28 Lewis Incident Report at 3.)

The correctional officers decided that McKinney should remain handcuffed and shackled while in the restraint chair. (Wingate Report at 4.) Nine different officers—including as many as six officers simultaneously—lifted McKinney and forced him into the

---

[6] A restraint chair is a specialized chair used to control a combative or self-destructive person. The back and seat of the chair are angled in a slight reclining position to help calm the person yet maintain the person's upright positioning. The chair includes many straps and belts to secure a person's torso and limbs, and the chair has wheels to enable safe transport of the person. (*See* DE 194-1 at 59.)

restraint chair. (Videotape: Overhead Video of Unit A (Fayette County Detention Center May 22, 2012) (on file with the Court), hereinafter "Overhead Video," Time Counter 10:30 to 12:30.) McKinney struggled with the correctional officers for two minutes as they secured him in the restraint chair. (Overhead Video, Time Counter 10:30 to 12:30.)

While other correctional officers secured McKinney in the restraint chair, Officer Powell retrieved a handheld video camera. (DE 178-35 Powell Incident Report, hereinafter "Powell Report," at 2.) The handheld video recording commenced shortly after McKinney was secured. (Videotape: Handheld Video of Unit A (Fayette County Detention Center May 22, 2012) (on file with the Court), hereinafter "Handheld Video," Time Counter 0:00.) While secured, he was repeatedly bobbing his head, grunting, and saying "okay." (Handheld Video, Time Counter 0:00 to 1:00.) An officer then clearly explained what happened in cell A9: "Legear was in there trying to help [McKinney], he was down because he had a seizure, and he starts spitting on the nurse." (Handheld Video, Time Counter 1:05 to 1:10.)

Although secured in the restraint chair, McKinney was obviously agitated. He repeatedly yelled out in pain and stated "oh fuck." (Handheld Video, Time Counter 1:45 to 3:30.) He actively convulsed his entire body, repeatedly rocked his head back and forth, and constantly spat into the spit hood. (Handheld Video, Time Counter 1:45 to 4:50.) The spit hood contained multi-colored liquids. Officer Jones and Officer Legear stabilized McKinney's head and reassured McKinney, stating "we know it hurts; calm down." (Handheld Video, Time Counter 3:00.)

While McKinney was secured in the restraint chair, no correctional officer or nurse performed a medical assessment of McKinney's condition or provided medical treatment. (*See* Overhead Video, Time Counter 10:30 to 23:15; Handheld Video, Time Counter 0:00 to 8:30.) He received a shot of Ativan to calm his agitation, but this shot was ordered by a

nurse practitioner who was not on site and not observing McKinney. (Schwartz Dep. at 80–85, 111.) Despite moving McKinney to a restraint chair in the program space to perform a medical assessment and decontaminate the residue from the two-second burst of pepper spray, neither an assessment nor decontamination occurred. (*See* Jones Report at 3.)

After receiving the Ativan shot, McKinney pleaded for assistance. (Handheld Video, Time Counter 3:50 to 4:00.) He stated "please, please, please" and repeated "help." (Handheld Video, Time Counter 3:50 to 4:00, 4:50 to 5:05.) He received no assessment or treatment. A minute after receiving the Ativan shot, McKinney ceased convulsing his entire body and yelling out; however, he continued rocking his head back and forth, spitting into the spit hood, and repeating "okay." (Handheld Video, Time Counter 4:50 to 7:00.) He then became completely lethargic. Approximately a minute later, the correctional officers wheeled McKinney from the program space to A1—an isolated cell in the Medical Unit. (Handheld Video, Time Counter 8:30 to 9:10.) Overall, McKinney remained in the restraint chair for nearly thirteen minutes without receiving a medical assessment or treatment. (Overhead Video, Time Counter 10:30 to 23:15.)

Cell A1 is significantly smaller than cell A9 and only McKinney and Officers Elko, Jones, Legear, Moss, and Womack entered; every other correctional officer stood outside the cell. (Jones Report at 3–4; Legear Report at 4.) Officer Jones explained what the officers intended to do. (Handheld Video, Time Counter 9:10 to 9:50.) McKinney responded, repeating "okay." (Handheld Video, Time Counter 9:50 to 10:50.) Officers Elko, Jones, Legear, Moss, and Womack began the minute-long process of unlocking and removing the various straps from the restraint chair. (Handheld Video, Time Counter 10:00 to 11:00; *see also* Jones Report at 4.) Officer Legear exited cell A1 because his gloves broke. (Handheld Video, Time Counter 11:15.)

Then, Officers Elko, Jones, Moss and Womack lifted McKinney out of the restraint chair. (Handheld Video, Time Counter 11:35; *see also* Jones Report at 4.) McKinney was standing in cell A1, but his arms remained handcuffed behind his back and his legs were still shackled. He stood in front of a "boat." A boat is a slang term commonly used by FCDC staff to refer to an upside-down bunk on the floor that often includes additional padding. (DE 185 LFUCG Defs.' Mem. of Supp. of Mot. for Summ. J. at 10 n.11.)

Officers Elko, Jones, Moss, and Womack directed McKinney to kneel in the boat. (Handheld Video, Time Counter 11:50 to 12:00; *see also* Jones Report at 4.) He did not voluntarily kneel in the boat; therefore, multiple officers began striking McKinney to force him to his knees. (Handheld Video, Time Counter 11:50 to 12:05.) Once he was kneeling, the correctional officers forced McKinney into a prone position. (Handheld Video, Time Counter 12:05.) Two officers held McKinney in a prone position by keeping a hand or knee on his back. (Handheld Video, Time Counter 12:05 to 13:45.)

In the prone position, correctional officers removed McKinney's spit hood and a nurse administered saline solution to McKinney's face to decontaminate the pepper spray residue. (Handheld Video, Time Counter 13:15.) McKinney became listless and unresponsive. The officers told McKinney to turn his head; he did not respond. (Handheld Video, Time Counter 14:05.) Officers asked: "Hey Jeff, hey buddy, you still with me?" and "Jeff, can you hear us?" (Handheld Video, Time Counter 14:50 to 15:00.) McKinney did not respond; he remained face-down and motionless in the boat for an additional minute before Officer Jones yelled, "Jeff! Jeff! Jeff! Let's get him rolled over. Let's get him rolled over. Let's get him rolled over! Jeff! Oh shit!" and another correctional officer yelled out, "We need nurses! We need nurses!" (Handheld Video, Time Counter 16:15 to 16:30.)

8

An officer requested a "Code 101." (Handheld Video, Time Counter 16:40.) Code 101 is signaled when an inmate has no apparent pulse or respiration. (DE 194-1 at 20.) After the Code 101, Officer Legear reentered the cell; Officers Elko and Womack exited. (*See* Jones Report at 4; Legear Report at 4; Moss Report at 3.) The correctional officers turned McKinney on his side and removed his handcuffs. (Handheld Video, Time Counter 16:40 to 17:20.) After removing McKinney's handcuffs, Officers Jones, Legear, and Moss rotated between administering chest compressions, providing rescue breaths with a bag valve mask, and resting to avoid fatigue. (Jones Report at 4; Legear Report at 4; Moss Report at 3.) The correctional officers continued administering CPR until Emergency Medical Services arrived and took over McKinney's care. (Arnold Report at 2; Jones Report at 4.)

McKinney was declared dead at 7:35 p.m., less than an hour and a half after suffering his second seizure in the Medical Unit. (*Compare* Legear Report at 3, *with* DE 178-39 Death Certificate at 2.) The deputy coroner declared that McKinney's cause of death was asphyxia due to aspiration of gastric contents as a consequence of a seizure disorder. (DE 178-39 Death Certificate at 2.)

## II. ANALYSIS

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, a Court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, the Defendants assert the following motions for summary judgment: (A) the Defendant-Officers[7] claim that they are entitled to complete summary judgment on the basis of qualified immunity (DE 176 Defs.' Renewed Mot. for Summ. J. at 9; DE 185 LFUCG Defs.' Mem. of Supp. of Mot. for Summ. J. at 18); (B) the Defendant-Officers contend that they are entitled to rely on qualified immunity to preclude liability for Plaintiffs' state tort claims or, alternatively, that Plaintiffs' claim for intentional infliction of emotional distress should be dismissed (DE 76-1 Defs.' Mem. of Supp. of Mot. for Summ. J. at 26–30; DE 185 LFUCG Defs.' Mem. of Supp. of Mot. for Summ. J. at 37–40); (C) the municipal Defendants assert that Plaintiffs conceded their arguments against sovereign immunity and improperly raised an inadequate training claim (DE 201-1 LFUCG Defs.' Reply in Supp. at 23–25); and (D) the Corizon[8] medical Defendants move for partial summary judgment because they claim that *Minneci v. Pollard* precludes liability against private employees providing medical care or, alternatively, that the medical employees were not deliberately indifferent to McKinney's medical needs. (DE 182-24 Defs.' Br. in Supp. of Mot. for Partial Summ. J. at 5–7.)

## A. Qualified Immunity

Qualified immunity shields government officials from civil liability unless their conduct violates clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official may invoke qualified immunity, a court must decide whether—viewed in the light most favorable to the plaintiff—the alleged facts demonstrate

---

[7] Plaintiffs indicated that they "no longer desire to pursue their claims against Wingate and, therefore, have no objection to summary judgment dismissing the claims against her." (DE 195 Pls.' Resp. to Renewed Mot. for Summ. J. at 2.) Accordingly, the Court will grant summary judgment in favor of Defendant Joquetta Wingate without further discussion.

[8] Plaintiffs indicated that they do not intend to pursue a § 1983 claim against Defendant Corizon, Inc. (DE 191-1 Pls.' Resp. to Corizon Defs.' Mot. for Partial Summ. J. at 44.) Therefore, Plaintiffs are only seeking a § 1983 claim against the Corizon nurses in their individual capacities, and all references to Corizon reflect only these live claims at issue.

that the official's conduct violated a constitutional right and whether the particular right allegedly violated was clearly established at the time the violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### 1. Deliberate Indifference

The standards for deliberate indifference were clearly established well before McKinney's incarceration. *Pearson*, 555 U.S. at 232. In *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), the Supreme Court found that Eighth Amendment "principles establish the government's obligation to provide medical care" to inmates and that an inmate "must rely on prison authorities to treat his medical needs." Therefore, the Court held that

> deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104 (internal citations and quotations omitted). In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court reiterated that the Eighth Amendment imposes a duty on prison officials to provide adequate medical care and take reasonable measures to guarantee inmates' safety. The Court also clarified that deliberate indifference is only actionable if two requirements are met: (1) the official must fail to protect an inmate from an objective, "sufficiently serious" harm; and (2) the official must subjectively have a "sufficiently culpable state of mind." *Id.* at 834.

Objectively, a medical need is sufficiently serious "if it has been diagnosed by a physician that has mandated treatment or it is *so obvious* that even a lay person would easily recognize the need for medical treatment." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (emphasis added). In recognizing the "obviousness" approach, the Sixth Circuit

identified that an inmate is especially vulnerable to obvious deliberate indifference during emergency medical situations "because they involve life-threatening conditions or situations where it is apparent that delay would *detrimentally exacerbate* the medical problem . . . ." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis added) (internal quotations omitted).

Subjectively, an official's state of mind is sufficiently culpable if the official "acted with 'deliberate indifference' to a serious medical need." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). An official is deliberately indifferent if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. But an official is not free to ignore *obvious* dangers to inmates and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. *Id.* at 843–44. "Since government officials do not readily admit the subjective component, a factfinder may infer from circumstantial evidence, including the very fact that the risk was *obvious*, that a prison official knew of a substantial risk." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (emphasis added) (internal quotations omitted).

Context informs whether—viewed in the light most favorable to Plaintiff—the alleged facts demonstrate that the correctional officers were deliberately indifferent to McKinney's serious medical needs. *See, e.g.*, *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550–52 (6th Cir. 2009) (finding that a prison medical professional with knowledge of critical environmental factors and an inmate's response to those factors could be found deliberately indifferent for delaying a medical assessment or medical treatment); *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006) (noting that a prison employee must have

"sufficient exposure" to the inmate and the inmate's medical concerns to exhibit deliberate indifference); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844–47 (6th Cir. 2002) (holding that officials may be found deliberately indifferent if the officials had knowledge of a person's history of medical emergencies at the facility and the environmental factors present in the facility immediately preceding a person's death).

Here, FCDC signaled three alerts concerning McKinney. Officer Wingate toned a Code 100 at 6:19 p.m. for assistance in A9, a cell in the Medical Unit. (Wingate Report at 3.) Therefore, medical staff and officers responding to the code were aware that an inmate was suffering a medical emergency while housed in the Medical Unit. Officers Clarissa Arnold, Nicholas Elko, Randy Jones, Eric Legear, Adam Moss, and Regina Powell responded to Officer Wingate's Code 100. (Arnold Report at 2; DE 178-34 Elko Incident Report, hereinafter "Elko Report," at 3; Jones Report at 3; Legear Report at 3; Moss Report at 3; DE 212-4 Dep. of Regina Powell, hereinafter "Powell Dep.," at 27.) Then, during the struggle that ensued in cell A9, Officer Arnold requested a Signal 7 for assistance in Unit A. (Arnold Report at 2.) Correctional officers who responded to the signal were aware that fellow officers needed assistance with an inmate who was struggling in the Medical Unit. Officer Donald Womack responded to the Signal 7. (DE 178-38 Womack Incident Report, hereinafter "Womack Report," at 3.) Finally, Officer Elko toned a Code 101 at 6:50 p.m. (Moss Report at 3.)

After issuing the Code 100 and Signal 7, the correctional officers removed McKinney from cell A9 and secured him in a restraint chair. (Moss Report at 3.) Once he was secured in the restraint chair, the correctional officers discussed what had happened to cause both the Code 100 and Signal 7. (*See* Handheld Video, Time Counter 1:00 to 1:10.) An officer in the program space clearly explained that "Legear was in [A9] trying to help [McKinney], he

was down because he had a seizure, and he starts spitting on the nurse." (Handheld Video, Time Counter 1:05 to 1:10.)

Therefore, once McKinney was secured in the restraint chair, context illustrates that the correctional officers knew the following facts: (1) McKinney was located in the Medical Unit (Jones Report at 3); (2) He suffered a medical emergency, specifically a seizure (Handheld Video, Time Counter 1:05 to 1:10); (3) He was bleeding from the mouth after suffering his second seizure (Legear Report at 3); (4) He had vomited at least once (Jones Report at 3); (5) He received a two-second burst of pepper spray (Jones Report at 3); (6) He struggled with the officers for over seven minutes *after* having experienced his second seizure that day (Overhead Video, Time Counter 2:40 to 7:20, 8:15 to 8:45, 9:30 to 10:00, 10:30 to 12:30); and (7) His spit hood contained multi-colored fluids (Handheld Video, Time Counter 0:00 to 8:30).

While McKinney was secured in the restraint chair, the context indicates that it was obvious that he was at a substantial risk of serious harm and that many of the correctional officers that were present had "sufficient exposure" to McKinney's medical concerns. *See Santiago*, 734 F.3d at 591; *Clark-Murphy*, 439 F.3d at 290; *see also* DE 194-1 at 7, 30, 32–33, 46, 51 (explaining that a seizure exhausts *every* muscle in the body, and describing the "Three Minute Rule" for Sudden Custody Death Syndrome—an inmate is at an elevated risk of sudden death after struggling with correctional officers for at least three minutes because the inmate may have extremely high lactic acid levels and extremely low oxygen levels).

Objectively, McKinney's distress was so obvious that even a lay person would easily recognize his need for medical treatment. *See Burgess*, 735 F.3d at 476. He was clearly in a vulnerable state. *See Blackmore*, 390 F.3d at 897; *see also* Handheld Video, Time Counter

14

3:50 to 4:00, 4:50 to 5:05 (repeating the words "please" and "help"). The failure to provide medical treatment detrimentally exacerbated McKinney's medical issues; he died. *See Blackmore*, 390 F.3d at 897.

Subjectively, the correctional officers were not free to ignore the obvious dangers to McKinney. *Farmer*, 511 U.S. at 837; *Santiago*, 734 F.3d at 591. Further, some of the Defendant-Officers concede knowledge of the numerous factors that created McKinney's vulnerable state and admit that they knew that McKinney needed medical attention following his seizure and prolonged struggle before being confined to the restraint chair. (Elko Report at 3; Jones Report at 3; DE 76-17 Dep. of Nicholas Elko at 77–78, 83–85, 90–91, 95–96, 98–100, 115, 137, 140, 175, 180–81, 187–88, 192–93; DE 76-20 Dep. of Randolph Jones at 43, 45–46, 55, 73–76, 131, 145–46, 165, 173, 179; DE 212-2 Dep. of Eric Legear at 29–32, 35–37, 42–44, 58–59, 62, 66–67, 69, 79; DE 212-1 Dep. of Adam Moss at 47–48, 50–53, 60, 68–73, 98, 108–09.)

Accordingly—and viewing the evidence in the light most favorable to Plaintiffs—a factfinder may infer that the Defendant-Officers met the objective and subjective *Farmer* standards for deliberate indifference. *See Farmer*, 511 U.S. at 834; *Santiago*, 734 F.3d at 591; *Burgess*, 735 F.3d at 476. But the Court will defer ruling on whether a particular Defendant-Officer may invoke qualified immunity until the evidence at trial establishes the officer's knowledge at each critical point in time between McKinney's second seizure and his death.

### 2. Excessive Force

The standards for excessive force have been clearly established for decades. *Pearson*, 555 U.S. at 232. The Supreme Court has repeatedly held that the Eighth Amendment prohibits excessive force against prisoners. *See, e.g.*, *Wilkins v. Gaddy*, 559 U.S. 34, 37–40

(2010); *Farmer*, 511 U.S. at 832–35; *Hudson v. McMillian*, 503 U.S. 1, 4–9 (1992); *Whitley v. Albers*, 475 U.S. 312, 318–22 (1986). Eighth Amendment excessive force claims also include a subjective component and an objective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).

Subjectively, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. This analysis is guided by a number of factors including (1) the extent of the inmate's injury, (2) the need for application of force, (3) the relationship between the need for force and the amount of force used, (4) the extent of the threat that the officials reasonably perceived, and (5) the efforts—if available—of the officials to deescalate the situation. *Id.*

Objectively, a court must analyze whether the official inflicted "sufficiently serious" force. *See Cordell*, 759 F.3d at 580; *see also Wilkins*, 559 U.S. at 38 ("Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. Therefore, the extent of the inmate's injury may provide an indication of the amount of force applied, but "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 37–38.

Here, correctional officers applied force to restrain McKinney while in cell A9 and in cell A1, but—importantly—the officers' actions occurred in the *Medical* Unit and in response to a *medical emergency*. *See Tolan*, 134 S. Ct. at 1866 (noting that the context of an official's actions is critical to the qualified-immunity analysis).

16

Officers Wingate and Legear first responded to McKinney. Both officers saw McKinney spit and perceived his actions as overt defiance; however, the officers assisted McKinney during his second seizure of the day, observed that he had severely bitten his tongue, and noted that he had a lot of bloody, frothy saliva secretions coming out of his mouth. (Legear Report at 3; Wingate Report at 3.)

Officers Arnold, Elko, Jones, Moss, and Powell arrived after McKinney ceased actively seizing, but all officers responded to a Code 100—a *medical* emergency—in the *Medical* Unit. (*See* Arnold Report at 2.) Nonetheless, the officers quickly escalated the amount of force used against McKinney; all seven officers "g[o]t physical" and "assisted with restraining" McKinney within minutes of his second seizure. (Arnold Report at 2; Jones Report at 3.) And rather than attempting to pacify a medically delicate situation, multiple officers performed mandibular angle pressure point control techniques and Officers Elko administered a two-second burst of pepper spray to McKinney's face. (Jones Report at 3; Moss Report at 3; Wingate Report at 3.)

After McKinney had suffered his second seizure, endured seven correctional officers "going hands on" for approximately five minutes, received multiple mandibular angle pressure point control techniques, and experienced a two-second burse of pepper spray to his face, Officer Jones determined that McKinney "continued to be unstable." (Overhead Video, Time Counter 2:40 to 7:20; Jones Report at 3.) Officer Wingate put a spit hood over McKinney's head. (Wingate Report at 3–4.) Nine different officers then assisted in picking McKinney up, dragging him to the program space, forcing him into the restraint chair, and securing him into the chair. (Overhead Video, Time Counter 10:30 to 12:30.)

Later, the correctional officers decided to move McKinney to an isolated cell in the Medical Unit. Inside cell A1, the correctional officers removed many of McKinney's

17

restraints, but he remained handcuffed and shackled. (Handheld Video, Time Counter 10:00 to 11:00.) Some officers then lifted McKinney out of the restraint chair. (Handheld Video, Time Counter 11:30 to 11:40.) The officers told him to kneel down in the boat. (Handheld Video, Time Counter 11:50 to 12:00.) McKinney—having experienced two seizures in one day, actively struggled with correctional officers for over seven minutes, received no medical care, and remained handcuffed and shackled with a spit hood on his head—did not immediately kneel. (Handheld Video, Time Counter 11:50 to 12:05.) The correctional officers then commenced striking McKinney with their knees and forced McKinney into a prone position in the boat. (Handheld Video, Time Counter 12:00 to 12:10; *see also* Elko Report at 3.) At least one officer kept a hand or knee on top of McKinney's back at all times to keep him in the prone position. (Handheld Video, Time Counter 12:05 to 13:45.) Within minutes of being forced into the prone position, McKinney ceased breathing. (Handheld Video, Time Counter 14:50 to 16:30.)

Subjectively, the correctional officers met *Hudson*'s standard for excessive force. *See Hudson*, 503 U.S. at 7. First, McKinney died. Second, it is not clear that the officers needed to apply force at all—officers saw blood and froth in McKinney's mouth after his second seizure; it is understandable that he would clear the blood and froth from his mouth—to apply considerable force over an extended period, or to apply any additional force once he was secured in the restraint chair. *See United States v. Bunke*, 412 F. App'x 760, 766–67 (6th Cir. 2011) (finding that a "takedown" of an inmate who may have been defensively resistant but "posed no threat" violated the inmate's Eighth Amendment rights). Third, officers used more force than was needed. The officers were responding to a *medical* emergency, McKinney only exhibited defensive resistance after officers escalated the use of force, and McKinney did not actively threaten anyone. *See id.* Fourth, the officers did not

18

perceive a threat. (*See* Moss Report at 3.) The correctional officers did *not* need to make *any* split-second decisions. *Cf. Davis v. Agosto*, 89 F. App'x 523, 526–27 (6th Cir. 2004) (noting that use of force in split-second circumstances and in response to an actively resistant inmate does not violate Eighth Amendment protections). Finally, there is no evidence that the officers sought to deescalate the situation.

Objectively, the correctional officers administered "sufficiently serious" force. *See Cordell*, 759 F.3d at 580. The officers "got physical" with McKinney, applied mandibular angle pressure point control techniques, administered a two-second burst of pepper spray, secured him in a restraint chair for over thirteen minutes, struck him with their knees, pinned him down in the boat, and physically struggled with him for over seven minutes. Further, this altercation ultimately ended in McKinney's death. McKinney experienced significant injury because of "prison officials['] malicious[ ] and sadistic[ ] use [of] force . . . ." *Hudson*, 503 U.S. at 9.

Accordingly—and viewing the evidence in the light most favorable to Plaintiffs—a factfinder may infer that the Defendant-Officers met the subjective and objective *Hudson* standards for excessive force. *See Hudson*, 503 U.S. at 7, 9. But the Court will defer ruling on whether a particular Defendant-Officer may invoke qualified immunity until the evidence at trial establishes the amount of force used by each Defendant-Officer at each particular time and the Defendant-Officer's rationale for applying force at that time.

## B. State Law Claims Against FCDC Officers

Plaintiffs also assert state law claims for negligence, intentional assault, intentional infliction of emotional distress, wrongful death, and loss of consortium. (DE 144 Am. Compl. ¶¶ 281–89.) Although these claims arise under Kentucky law, this Court has supplemental jurisdiction to address the state law claims "that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Plaintiffs have pleaded that the Defendants violated McKinney's Eighth Amendment rights and, thus, violated § 1983. (DE 144 Am. Compl. ¶¶ 29–280.) Plaintiffs state law claims arise out of the same case and controversy as the alleged Constitutional violations. (DE 144 Am. Compl. ¶¶ 281–89.) The Defendant-Officers contend that they enjoy qualified immunity from liability under Kentucky state torts and, in the alternative, that this Court should dismiss the claim of intentional infliction of emotional distress. (DE 201 LFUCG Defs.' Reply in Supp. of Mot. for Summ. J. at 16–22.)

### 1. Qualified Immunity

"[P]ublic officers and employees are entitled to 'qualified official immunity' for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (*i.e.* were not made in 'bad faith'), and (3) were within the scope of the employee's authority." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). If an officer claims qualified immunity and demonstrates that the act or omissions occurred within the scope of his or her discretionary authority, then "the burden shifts to the plaintiff to establish by direct *or circumstantial* evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (emphasis added). "Cases are indeed rare where one admits an improper motive;" therefore, a plaintiff may establish a lack of good faith with "proof of a violation of a 'clearly established right' of the plaintiff, which 'a person in the [officer]'s position presumptively would have known was afforded to a person in the defendant's position.'" *Rowan Cnty.*, 201 S.W.3d at 481 (quoting *Yanero*, 65 S.W.3d at 523).

Here, the Defendant-Officers are not entitled—on summary judgment—to assert qualified immunity for Plaintiffs' §1983 claims and, because Plaintiffs may be able to establish that these officers violated McKinney's clearly established rights, cannot assert qualified immunity for Plaintiffs' state law claims. *Supra* Part II.A.1, Part II.A.2.

### 2. Intentional Infliction of Emotional Distress

The Kentucky Supreme Court first recognized the claim of intentional infliction of emotional distress in *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984). The court expressly adopted the definition of the tort articulated in the Restatement (Second) of Torts § 46. *Id.* at 251. The elements of proof necessary to sustain a claim of intentional infliction of emotional distress include:

> 1) the wrongdoer's conduct must be intentional or reckless;
> 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
> 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
> 4) the emotional distress must be severe.

*Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2–3 (Ky. 1990). The Kentucky Supreme Court has "set a high threshold for IIED/outrage claims" such "that the conduct at issue must be a deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 791 (Ky. 2004) (internal quotations omitted). Also, Kentucky state courts acknowledge that the tort was intended as a "'gap filler' tort, and that if an action can lie in a 'tradition tort,' 'the tort of outrage will not lie.'" *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012) (quoting *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993)).

Here, Plaintiffs cannot assert facts that meet the high threshold for intentional infliction of emotional distress set by the Kentucky Supreme Court. There is no evidence

21

that any of the correctional officers' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bound of decency, and to be regarded as atrocious." *Stringer*, 151 S.W.3d at 789 (internal quotations omitted). Further, Plaintiffs claim, and Defendants do not contest the availability of, four additional state law torts. *See Childers*, 367 S.W.3d at 581–83. Therefore, the claim for intentional infliction of emotional distress must be dismissed.

## C. Municipal Liability

For a municipality to be liable under § 1983, a plaintiff must allege that a constitutional violation occurred because of a municipal policy or custom. *Burgess*, 735 F.3d at 478 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478.

Here, Plaintiffs' Amended Complaint raises counts against LFUCG and the LFUCG Division that assert all four theories under *Burgess*. (*See* DE 144 Am. Complaint ¶¶ 211–60.) LFUCG and the LFUCG Division moved for summary judgment on these claims. (DE 185 LFUCG Defs. Mem. of Law in Supp. of Mot. for Summ. J. at 40–62.) Plaintiffs responded but did not address any of LFUCG's arguments. (*See* DE 193-1 Pls.' Resp. to LFUCG Defs.' Mot. for Summ. J. at 59–71.) Instead, Plaintiffs articulated a new theory of liability—LFUCG's inadequate spit hood training—that was not raised in Plaintiffs' Amended Complaint. (DE 193-1 Pls.' Resp. to LFUCG Defs.' Mot. for Summ. J. at 59–71.) Plaintiffs' Amended Complaint asserted inadequate training and supervision "of those

22

medical staff that provided medical care and treatment" but did not assert a failure to properly train correctional officers. (*See* DE 144 Am. Complaint ¶¶ 227–31, 252–56.)

The "law is clear: when a plaintiff fails to assert a theory in her complaint, she may not raise it for the first time in response to the defendants' summary-judgment motion." *Golembiewski v. Logie*, 516 F. App'x 476, 478 (6th Cir. 2013) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Further, failure to oppose arguments in a dispositive motion may be interpreted as waiving opposition to the dispositive motion. *See Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008); *see also Scott v. State of Tenn.*, 878 F.2d 382, 1989 WL 72470, at *2 (6th Cir. July 3, 1989) (unpublished table decision) ("[I]f a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion.")

Accordingly, Plaintiffs cannot assert any claims of municipal liability against LFUCG and LFUCG Division. Plaintiffs, by virtue of failing to respond to LFUCG's motion for summary judgment, have waived opposition to summary judgment on the claims asserted in the Amended Complaint against LFUCG and LFUCG Division. *See Humphrey*, 279 F. App'x at 331. And Plaintiffs may not assert a new theory of municipal liability— inadequate spit hood training—in response to LFUCG's summary-judgment motion. *See Golembiewski*, 516 F. App'x at 478.

**D. The medical Defendants' § 1983 Liability**

    *1*. Minneci v. Pollard *Does Not Bar Claims Against Corizon Defendants.*

The medical Defendants assert that *Minneci v. Pollard*, 132 S. Ct. 617 (2012), bars a right of action under the Constitution against a private contractor and its employees. (DE 182-24 Defs.' Br. in Supp. of Mot. for Partial Summ. J. at 18–20.) In *Minneci*, the Supreme

Court declined to extend a *Bivens* cause of action to claims by *federal* prisoners seeking damages from privately employed personnel working at a privately operated *federal* prison. 132 S. Ct. at 626. *Minneci* does *not* hold that *state* prisoners seeking damages from privately employed personnel providing medical services at *local* prisons are barred from bringing actions under § 1983. After *Minneci*, the Sixth Circuit has continued to recognize § 1983 claims against private medical service providers. *See Reed-Bey v. Pramstaller*, 2015 WL 1500510, at *4 (6th Cir. Apr. 2, 2015); *O'Brien v. Mich. Dep't of Corrs.*, 592 F. App'x 338, 341 (6th Cir. 2014); *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 554, 560–61 (6th Cir. 2014); *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 677–78 (6th Cir. 2013); *Lane v. Wexford Health Sources (Contreator)*, 510 F. App'x 385, 387 (6th Cir. 2013).

### *2. Deliberate Indifference*

"[A] private entity that contracts to perform traditional state functions may be sued pursuant to § 1983." *Lane*, 510 F. App'x at 387 (internal quotations omitted). And the Eighth Amendment prohibits employees of the private entity from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" to the inmate's serious medical needs. *O'Brien*, 592 F. App'x at 342. An inmate's claim for deliberate indifference based upon the denial of adequate medical care includes a subjective component and an objective component. *Id.* Objectively, the plaintiff must allege a sufficiently serious medical need. *Id.* Subjectively, the plaintiff must allege "facts which show that the [private employee] being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* (internal quotations omitted). The context of the inmate's medical needs and a private employee's knowledge of the contextual predicates to the inmate's medical needs may clarify whether a private employee "did in fact draw the

24

inference" necessary to demonstrate the subjective component of a deliberate indifference claim. *See Dominguez*, 555 F.3d at 550–52; *see also supra* Part II.A.1.

Here, the medical professionals had more knowledge of McKinney and his medical history than the correctional officers. Once McKinney was secured in the restraint chair, context indicates the following: (1) McKinney had a history of suffering from seizures (Brown Dep. at 39–40); (2) He regularly took anticonvulsant and antiseizure medication, including Ativan (Brown Dep. at 46–48); (3) FCDC did not permit McKinney to continue taking his full regimen of medication (Schwartz Dep. at 58); (4) He had spent the previous four days in the Medical Unit receiving a benzodiazepine withdrawal protocol from Ativan (Schwartz Dep. at 68–71); (5) McKinney suffered a seizure within a day of finishing the benzodiazepine withdrawal protocol (Schwartz Dep. at 72–73); (6) He was confused and disoriented after suffering his first seizure (Schwartz Dep. at 75); (7) McKinney was transported from the general population to the Medical Unit in a wheelchair (Lowe Report at 2); (8) Within hours, he suffered a second seizure in the Medical Unit (Northrip Dep. at 51, 62–63); (9) McKinney was secreting "a lot" of "frothy" and "bloody" fluids from his mouth (Northrip Dep. at 68); (10) He was dazed after he suffered his second seizure (Northrip Dep. at 69); (11) McKinney had urinated himself (Northrip Dep. at 70); (12) He and the correctional officers engaged in a prolonged struggle that included use of pepper spray (Northrip Dep. at 87); (13) McKinney had not received a medical assessment or medical treatment after suffering his second seizure (Newton Dep. at 39, 46); (14) He was wearing a spit hood (Newton Dep. at 39); and (15) McKinney had received a sedative (Newton Dep. at 47).

Context illustrates that the medical staff did not commit a minor oversight. Rather, while McKinney was secured in the restraint chair, the medical staff knew his medical

history, knew his medical issues while in FCDC, knew he had not received a medical assessment or any medical treatment after his second seizure, and knew he was in a susceptible state. The correctional officers cleared the Signal 7—indicating it was safe to approach McKinney. (Jones Report at 3.) It was obvious to the medical professionals that McKinney was at a substantial risk of serious harm. *See Dominguez*, 555 F.3d at 550–52; *Terrance*, 286 F.3d at 844–47. Objectively, his need for medical treatment was obvious. *See supra* Part II.A.1. Subjectively, the nurses that responded to the Code 100 admit knowledge of the contextual predicates to McKinney's vulnerable and lethargic state in the restraint chair. (Newton Dep. at 27–29, 32, 37–39, 43, 46–47, 54–57; Northrip Dep. at 59–60, 67–70, 75, 87, 90, 103–11, 115–19; DE 182-13 Dep. of Dinesh Patel at 35–43; DE 182-6 Dep. of Sherry Slone at 53–54, 58, 61–65, 67–69, 71–74, 77–79; DE 182-8 Dep. of Shirley Wheeler at 36, 40, 44, 49–52, 60–61.) Therefore, viewing the evidence in the light most favorable to Plaintiffs, a factfinder may infer that the substantial risk of serious harm to McKinney was obvious and Nurses Newton, Northrip, Patel, Slone, and Wheeler met the objective and subjective requirements for deliberate indifference for failing to provide any medical assessment or medical treatment while McKinney was secured and lethargic in the restraint chair. *See Farmer*, 511 U.S. at 834, *Dominguez*, 555 F.3d at 550–52.

### III. CONCLUSION

Accordingly, the Court **ORDERS** as follows:

1. Defendants' second motion for summary judgment (DE 176) is **GRANTED IN PART** as to Defendant Joquetta Wingate and **DENIED IN PART** as to Defendants Nicholas Elko and Randy Jones;

2. Defendants' motion for summary judgment (DE 177) is **GRANTED IN PART** as to Count 3 against all Defendants and all counts against Defendants Lexington-

Fayette Urban County Government and Lexington-Fayette Urban County Government, Division of Community Corrections; and **DENIED IN PART** as to Defendants Clarissa Arnold, Eric Legear, Adam Moss, Regina Powell, and Donald Womack;

3. Defendants' partial motion for summary judgment (DE 182) is **GRANTED IN PART** as to Defendant Corizon, Inc. and **DENIED IN PART** as to Defendants Trevor Newton, Laura Northrip, Dinesh Patel, Sherry Slone, and Shirley Wheeler;

4. Count 3 as against every defendant is **DISMISSED**; therefore,

5. All claims against the following Defendants are **TERMINATED**:

   a. Defendant Lexington-Fayette Urban County Government;

   b. Defendant Lexington-Fayette Urban County Government, Division of Community Corrections; and

   c. Defendant Joquetta Wingate.

Plaintiffs may proceed with all claims consistent with this Memorandum Opinion and Order, other than Count 3, against the following defendants: Randy Jones, Nicholas Elko, Adam Moss, Eric Legear, Clarissa Arnold, Regina Powell, Donald Womack, Laura Northrip, Shirley Wheeler, Trevor Newton, Dinesh Patel, and Sherry Slone. Plaintiffs may also proceed with the state law tort claims against Defendant Corizon, Inc. that were not subject to Defendants' partial motion for summary judgment (DE 182).

Dated July 1, 2015.



KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY